# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

* * *

| | |
|---|---|
| GO NEW YORK TOURS, INC. d/b/a "TEA AROUND TOWN, *et al*.<br><br>Plaintiff,<br><br>v.<br><br>TEA ON THE STRIP, LLC, *et al*.,<br><br>Defendants. | Case No. 2:25-cv-00279-RFB-EJY<br><br>**ORDER** |

Before the Court are the (ECF No. 31) Emergency Motion for Temporary Restraining Order and (ECF No. 32) Emergency Motion for Preliminary Injunction by Plaintiffs Kost, Inc., Go New York Tours, Inc., and Tea Around Town Las Vegas, Inc. For the following reasons, the Court grants the Motion for a Preliminary Injunction in part and denies the Motion for Temporary Restraining Order as moot.

## I.     PROCEDURAL HISTORY

On February 11, 2025, Plaintiffs filed their Complaint for Trademark Infringement (15 U.S.C. § 1114); Trade Dress Infringement/False Advertising (15 U.S.C. § 1125(a)(1)); Common Law Unfair Competition; and Deceptive Trade Practices. ECF No. 1. On February 26, 2025, Plaintiffs filed emergency Motions for a Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI"). ECF Nos. 11, 12. The Court ordered Plaintiffs to serve Defendants and for Defendants to file a response by March 4, 2025. ECF No. 13. On February 26, 2025, Defendants accepted service. ECF No. 16. On March 5, 2025, Defendants filed their response to the TRO/PI Motions. ECF No 19. On March 19, 2025, Defendants filed their Answer to the Complaint. ECF No. 23.

After the Court set the TRO/PI Motions for a hearing on April 10, 2025, ECF No. 25, Plaintiffs filed a declaration of Asen Kostadinov in support of their Motions. ECF No. 28. On April 10, 2025, the Court held a hearing on the pending Motions wherein Defendants described their efforts to resolve the dispute without intervention by the Court, including temporarily closing their business, changing their business name from "Tea on the Strip" to "Café on the Strip," modifying the design of their bus, and modifying their website and social media. ECF No. 30. The Court ordered Defendants to provide Plaintiffs "with all changes or modifications to designs of the bus (inside and out), the website, social media, and any other relevant modifications regarding the instant lawsuit by Saturday, April 12, 2025, at 5:00 p.m." Id. The Court further ordered a briefing schedule for a renewed PI/TRO, in the event that, after receiving Defendants' modifications, Plaintiffs sought further Court intervention.

Consistent with the Court's Order, Plaintiffs filed their renewed TRO/PI Motions on April 15, 2025. ECF Nos. 31-32. On April 16, 2025, Defendants filed their Opposition, ECF No. 33, and Plaintiffs filed their Reply. ECF No. 34. On April 17, 2025, the Court held a hearing on the renewed Motions. ECF No. 35. At the hearing, the Court granted Plaintiffs' PI Motion in part on the record, with a separate written ruling to follow. ECF No. 35. The Court's more detailed ruling is set forth below.

## II.    FACTUAL FINDINGS

The Court makes the following findings of fact relevant to the preliminary injunction.

The "Tea Around Town" Mark is registered and owned by Plaintiff Kost, Inc., and has been in continuous use by its exclusive licensee, Plaintiff Go New York Tours, Inc., since July 11, 2023. Plaintiffs operate "Tea Around Town," an upscale tea experience abroad a luxury double-decker bus, offering a unique and immersive customer experience. The Tea Around Town trade dress includes distinctive branding, including interior and exterior design of their double decker bus where they serve tea to customers. The design of Plaintiffs' bus features a predominantly pink color scheme with white and gold, incorporating florals, greenery, and illustrations of people partaking in high tea. The interior of the bus incorporates the pink, gold, and white color scheme including booths and table settings utilizing the same shade of pink, gold accents throughout,

souvenir tumblers with pink lids, and decorative pearl and sparkle strips along the ceilings. The staff uniforms also incorporate the same color pink.

Tea Around Town spent over two years and millions of dollars researching and developing their trade dress and marketing strategy. Its first bus tours began in New York City in July 2024. Since its inception, it has received significant recognition through extensive marketing, advertising, and word-of-mouth promotion. Tea Around Town operates in six cities and is actively expanding its operations throughout the United States and internationally. Tea Around Town in New York City was in operation for only five months when Beyonce and Jay-Z brought the family for a private tour, which made the company "TikTok-famous."[1] The company's content has received millions of views on TikTok and achieved national recognition as a unique tea-on-a-tour-bus experience.

Plaintiffs' records indicate, and Defendants do not contest, that between September 18, 2023, and March 15, 2024, Defendant Yolanda Drai and her son Defendant Dustin Drai patronized Tea Around Town on multiple occasions. On October 13, 2024, Defendant Dustin Drai formed "Tea on the Strip" in the State of Nevada. Defendants launched their business using the Tea on the Strip mark in or around February 2025. Defendants advertised their "Las Vegas Strip Bus Tour & Tea Experience" in social media posts on profiles under the name Tea on the Strip, displaying their own double decker tea bus which utilized a color scheme of predominantly pink—and a similar shade to Tea on the Town's pink—white and gold, and other features that were confusingly similar to Tea on the Town's bus design. In comments on Tea on the Strip's posts featuring both the exterior and interior design of the bus, multiple people posted comments indicating they believed Tea on the Strip was affiliated with Tea on the Town.

On February 14, 2024, Plaintiffs filed articles of incorporation in the State of Nevada, with the Office of the Secretary of State, for the entity Tea Around Town Las Vegas, Inc.

---

[1] Michael Capetta, <u>Beyoncé and Jay-Z just Took Their Kids on this TikTok-famous NYC Tour Bus</u>, Travel + Leisure (Dec. 22, 2023), https://www.travelandleisure.com/beyonce-and-jay-z-nyc-tiktok-famous-tour-bus-holidays-8419684?utm_source=emailshare&utm_medium=social&utm_campaign=shareurlbuttons.

### A. Plaintiffs' and Defendants' Marks

At the start of the lawsuit, Defendants used the below mark, set beside Plaintiffs' mark for comparison:

**Plaintiffs' Mark**       **Defendants' Mark**

 

Plaintiffs first contacted Defendants on February 11, 2025, with a demand letter and a copy of the Complaint they filed that day. The parties and their counsel engaged in settlement negotiations. Ultimately, Defendants agreed to cease operating their business until the instant dispute was resolved. They also agreed to change their name to "Café on the Strip" and now utilize the below mark:



### B. Defendants' Internet Presence

Defendants changed their social media profiles from "Tea on the Strip" to "Café on the Strip" but did not deactivate those profiles. At the time of the Court's hearing on the instant Motions, the Defendants confirmed that all social media 'tags' or digital markers that were previously associated with "Tea on the Strip" had been deleted so no online traffic was being redirected.

Defendants changed their website URL from teaonthestrip.com to cafeonthestrip.com.[2] Although the website name is changed, Defendants have left the "Tea on the Strip" name in its lists of keywords, which allows search engines to associate the site with a search for "Tea on the

---

[2] See archive of https://www.cafeonthestrip.com/ from Thursday 17, April 2025 at https://perma.cc/5D5A-A3ZW.

Strip."

### C. Defendants' Bus Design

At the hearing on Plaintiffs' first PI/TRO Motions, Defendants informed the Court of their efforts to resolve the dispute, including by proposing to Defendants modifications to their bus design. The Court ordered Plaintiffs to send modifications to their bus design "both interior and exterior," by April 12, 2025. Defendants sent Plaintiffs their proposed changes to the exterior of their bus, pictured below alongside Plaintiffs' bus design for comparison. They proposed no changes to the interior design of the bus (also pictured below).






Plaintiffs also presented evidence that the product Defendants have been offering since February are inferior based on the evaluation of their quality control expert who patronized Defendants' Tea on the Strip bus tour.

### III.    LEGAL STANDARD

The standard for issuing a temporary restraining order is the same as that for issuing a

preliminary injunction. Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co., 240 F.3d 832, 839 n. 7 (9th Cir. 2001). A TRO is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, Inc., 550 U.S. 7, 22 (2008).

A party seeking preliminary injunctive relief must make a "clear showing" that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. Id. at 7, 20, 22. The Ninth Circuit employs a sliding scale approach "under which a preliminary injunction c[an] issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [the moving party's] favor," provided that the moving party also makes a showing of irreparable harm and that an injunction is in the public interest. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-32, 1135 (9th Cir. 2011) (citation and internal quotation marks omitted) (holding that the "serious questions" approach survives Winter).

**IV.     DISCUSSION**

    **a.   Likelihood of Success on the Merits**

The Court considers Plaintiffs' likelihood of success on the merits of their trademark and trade dress infringement claims.

    *i.   Trademark Infringement*

In order to prevail on a trademark infringement claim, a plaintiff must show that: 1) it is the owner of the asserted marks; and 2) the use of the mark by the alleged infringer is likely to cause confusion or mistake or deceives the consumer. Survivor Media v. Survivor Productions, 406 F.3d 625, 630 (9th Cir. 2005). Plaintiff establishes it is the owner of the federally registered trademark and it has extensively advertised its product using this mark. To show there is a likelihood of a consumer confusing Defendants' mark with Plaintiffs', the Court considers eight factors, known as the "Sleekcraft" factors, in its determination: (1) The strength of the mark; (2) The similarity of the marks; (3) The relatedness of the goods; (4) The marketing channels used by the companies; (5) The alleged infringer's intent in selecting it mark; (6) Evidence of actual

1  confusion; (7) The likelihood of expansion into other markets, and; (8) The degree of care likely
2  to be exercised by purchasers of the good. GoTo.com, 202 F.3d at 1205. "Some factors are much
3  more important than others, and the relative importance of each individual factor will be case
4  specific." Brookfield Communications, Inc. v. West Coast Entertainment, Corp., 174 F.3d 1036
5  (9th Cir. 1999).

6        That Plaintiffs are the registered owner of the asserted Mark is undisputed. The Court thus
7  addresses each Sleekcraft factor in turn.

8                1.   Strength of the Mark

9        A mark's strength is evaluated based on two components: "the mark's inherent
10 distinctiveness (i.e., its conceptual strength)" and "the mark's recognition in the market (i.e., its
11 commercial strength)." Lahoti v. Vericheck, Inc., 636 F.3d 501, 508 (9th Cir. 2011)).

12               ***a.   Conceptual Strength***

13       A mark's conceptual strength "depends largely on the obviousness of its connection to the
14 good or service to which it refers." Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.,
15 Inc., 618 F.3d 1025, 1032–33 (9th Cir. 2010) (quoting JL Beverage Co., LLC v. Jim Beam Brands
16 Co., 828 F.3d 1098, 1107 (9th Cir. 2016)) To determine a mark's conceptual strength, the Court
17 must classify a mark along a spectrum of five categories ranging from strongest to weakest:
18 arbitrary, fanciful, suggestive, descriptive, and generic. Id. Arbitrary and fanciful marks, which
19 employ words and phrases with no commonly understood connection to the product, are the two
20 strongest categories, and "trigger the highest degree of trademark protection." Id. (citations
21 omitted). In the middle of the spectrum are suggestive marks, which suggest a product's features
22 and require consumers to exercise some imagination to associate the suggestive mark with the
23 product. Id. (citing Fortune Dynamic, 618 F.3d at 1033.) Id. Descriptive and generic marks, at the
24 other end of the spectrum, are the two weakest categories. Id. Descriptive marks define a particular
25 characteristic of the product in a way that does not require any imagination, while generic marks
26 describe the product in its entirety and are not entitled to trademark protection. Id.

27       Here, the Court finds the Mark "Tea Around Town" is suggestive. While it is descriptive
28 in that it describes aspects of the product: the beverage served and the location, it is suggestive in

that it does not state "tea on a bus" but rather "tea around town." It would require a consumer to exercise some imagination to interpret "tea around town" as meaning tea being served on a double decker bus while driving around a city.

### b. *Commercial Strength*

"After identifying whether a mark is generic, descriptive, suggestive, arbitrary, or fanciful, the court determines the mark's commercial strength." JL Beverage, 828 F.3d at 1107 (9th Cir. 2016). This is determined by "actual marketplace recognition." Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1149 (9th Cir. 2011). Advertising expenditures, which increase marketplace recognition, offer evidence of commercial strength and "can transform a suggestive mark into a strong mark." JL Beverage, 828 F.3d at 1107 (9th Cir. 2016) (citing Network Automation, 638 F.3d at 1149).

The Court finds the evidence of Plaintiffs' significant expenditures on advertising, brand recognition, investment by high profile celebrities like Beyonce and Jay Z, and "Tik-Tok fame," together with the fact that the tea tour bus model appears to be the first of its kind, together render "Tea on the Town" a strong mark.

### 2. Similarity of Marks

In considering the degree of similarity, a court should view the marks in their entirety as they appear in the marketplace. Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1144 (9th Cir. 2002). Additionally, a court should consider the similarity in appearance, sound and meaning. Id. Similarities are given more weight than differences. Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, 616 F.2d 440, 440 (9th Cir. 1980) (citing AMF, Inc. v. Sleekcraft Boats, 599 F.2d 348, 351 (9th Cir. 1979)).

Plaintiffs argue that the name follows the same formula consisting of the term "Tea" combined with a location-based descriptor and contains the same number of syllables. The Court finds this creates a similarity in sound and meaning. Further, the color scheme is the same, and the placement of the mark within a gold frame is the same. While the typeface of the marks and the color of the font are different, and the logos are formatted somewhat differently, the Court finds these differences are outweighed by the similarities and this factor weighs in favor of Plaintiffs.

### 3. Proximity or Relatedness of the Goods

"Related goods are those products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." Entrepreneur Media, Inc., 279 F.3d at 1147 (quoting AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348 n.10 (9th Cir. 1979)). "[T]he more closely related the goods are, the more likely consumers will be confused by similar marks." Id. The products, which are both experiential tours around a city serving high tea in a bus which emphasizes branding and design of the bus, such that the experience is an aesthetic one, where many consumers take photos while participating to be posted on social media, are clearly related.

### 4. Marketing Channels

"Convergent marketing channels increase the likelihood of confusion." Nutri/System, Inc. v. Con-Stan Industries, 809 F.2d 601, 606 (9th Cir. 1987). This factor does not require the sale of the goods by identical vendors, but rather "the same type of distribution channel." Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874 (Fed. Cir. 1992).

The Court notes the importance of social media marketing to both companies. Accordingly, Plaintiffs emphasize their concern that consumers who search "Tea on the Strip," or see photos of social media influencers with that tag, are directed to Defendants' renamed profile "Café on the Strip." Plaintiffs point to Defendants' social media posts where confused users refer to Tea on the Strip as potentially affiliated with Tea on the Town in New York or other locations. Further, Defendants' website includes a "Quick Link" for "influencer & media opportunities."[3] The Court therefore finds the parties use converging marketing channels through social media. This factor therefore supports a finding of likelihood of confusion.

### 5. Defendants' Intent in Selecting the Mark

Plaintiffs are not required to demonstrate the infringer "intended to deceive consumers." E.& J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1293 (9th Cir. 1992). Intent to confuse may be inferred when the "alleged infringer chooses a mark he knows to be similar to another." Entrepreneur Media, 279 F.3d at 1148 (citing Official Airlines Guides, Inc. v. Goss, 6 F.3d 1385

---

[3] See archive of https://www.cafeonthestrip.com/ from Thursday 17, April 2025 at https://perma.cc/5D5A-A3ZW.

- 9 -

(9th Cir. 1993)). Plaintiffs have presented evidence that Defendants repeatedly patronized Tea on the Town shortly before choosing the mark and establishing Tea on the Strip, and Defendants have not contested that evidence. In fact, Defendants have not produced admissible evidence contesting Plaintiffs' allegations that they did so with the intent of copying Plaintiffs' intellectual property. The Court finds they were at a minimum, aware of Plaintiffs' product when selecting their mark, and notes that a reasonable factfinder could infer from the evidence currently before the Court that Defendants chose Tea on the Strip's trademark and trade dress with the intent of deceiving customers. This factor weighs *heavily* in favor of Plaintiffs.

### 6. Evidence of Actual Confusion

Plaintiffs have presented evidence of actual confusion with people commenting on social media that they believe Tea on the Strip is related to Plaintiffs' company. This favor weighs heavily in favor of Plaintiffs.

### 7. Likelihood of Expansion

Plaintiffs have incorporated in Las Vegas. They have already expanded to six other cities and are investing significant resources expanding into other cities both nationally and internationally. This factor also weighs heavily in favor of a likelihood of consumer confusion.

### 8. The Degree of Care Likely to Be Exercised by Purchasers

The likelihood of confusion is determined by the "reasonably prudent consumer." Brookfield Commc'ns, 174 F.3d 1036, 1060 (9th Cir. 1999) (citing Dreamwerks Production Group, Inc., 142 F.3d 1127, 1129 (9th Cir. 1998); Sleekcraft, 599 F.2d at 353. A "reasonably prudent consumer" is expected to be "more discerning and less easily-confused" when purchasing expensive items, and when the products being sold are marketed primarily to expert buyers, and less discerning and more easily confused when purchasing inexpensive items. Id. The parties' respective tea bus tour products cost approximately $100. While that amount may be relatively costly, this is not a product marketed to expert buyers, and it is a relatively new concept marketed to unsophisticated consumers who are unlikely to have extensive experience with the product. Therefore, the Court finds this factor tips slightly in favor of Plaintiffs.

### 9. Conclusion

"Only a subset of the Sleekcraft factors are needed to reach a conclusion as to whether there is a likelihood of confusion." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1206 (9th Cir. 2000). Based upon the analysis of the Sleekcraft factors, the Court finds Plaintiffs have demonstrated a likelihood of confusion, and therefore finds that Plaintiffs have demonstrated a likelihood of success as to its trademark infringement claim.

### ii. Trade Dress

Trade dress involves "the total image of a product and may include features such as size, shape, color or color combination, texture, graphics, or even particular sales techniques." Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792, 808 n. 13 (9th Cir. 2003) (quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 765 n. 1 (1992)). To sustain a claim for trade dress infringement, Plaintiffs must prove: (1) that its claimed dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion. Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1258 (9th Cir. 2001). To determine whether a plaintiff is entitled to injunctive relief regarding its trade dress claim, the central inquiry is whether the defendant's use of the asserted dress is likely to cause consumer confusion. See Brookfield Commc'ns, 174 F.3d at 1053 (quoting Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1391 (9th Cir.1993) (characterizing the likelihood of confusion inquiry as "[t]he core element of trademark infringement").

The Court considers the elements of trade dress infringement and the likelihood of confusion in turn.

#### 1. Functionality

The "test for functionality proceeds in two steps." Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc., 457 F.3d 1062, 1072 (9th Cir. 2006). First, a court must evaluate a claimed trademark for utilitarian functionality. Id. If the mark lacks utilitarian functionality, the court must then proceed to the second step of the test to evaluate it for aesthetic functionality. Id. If the mark has either utilitarian or aesthetic functionality, it is ineligible for protection under trademark law. See id.

Where a trademark consists of a color scheme, the colors have utilitarian functionality only if the claimed colors are superior to alternative colors in performing the function that they were designed to perform. Zest Anchors, LLC v. Geryon Ventures, LLC, No. 22-55704, 2023 WL 2783175 (9th Cir. Apr. 5, 2023) (citing Moldex-Metric, Inc. v. McKeon Prods., Inc., 891 F.3d 878, 887 (9th Cir. 2018) (explaining that a claimed color selected for its visibility may lack utilitarian functionality where alternative colors are "equally or more visible"); Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 166 (1995) (explaining that a claimed color for a dry-cleaning press pad serves no utilitarian function where other colors are equally useful in performing the function of preventing stains). Plaintiffs' color scheme here serves no utilitarian functionality.

The test for aesthetic functionality is "whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." Au–Tomotive Gold, Inc. v. Volkswagen of America, Inc., 457 F.3d 1062, 1972 (9th Cir. 2006). The Court finds that Defendants have not established that they would be placed at a significant non-reputation-related competitive disadvantage if they were denied the right to use Plaintiffs' particular shade of pink combined with white and gold, or any of the other interior and exterior bus designs Defendants presented to the Court, which the Court finds are likely to be infringing. At the hearing on the instant motions, Defendants claimed they would be at a disadvantage because pink is the quintessential "feminine color," and they seek to market their product to women. The Court does not find that unsupported assertion persuasive. Moreover, this Court does not enjoin Defendants from using the color pink—the order is limited to the use of the particular shade of pink which predominates Plaintiffs' trade dress, combined with white and gold, as utilized by Defendants in the current bus designs before the Court. Defendants' only other claim of disadvantage is that it will be costly to change the bus design, *i.e.*, by having to reupholster their pink seats in the interior. This is not the kind of disadvantage that shows aesthetic functionality.

Therefore, the Court finds Plaintiffs' claimed trade dress is nonfunctional.

2. Distinctiveness/Secondary Meaning

In assessing distinctiveness, courts employ a five-part continuum of increasing inherent distinctiveness. A trademark or trade dress may be (1) generic, (2) descriptive, (3) suggestive, (4)

1    arbitrary, or (5) fanciful. Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir.
2    1976); see also GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1207 (9th Cir. 2000). Marks
3    and dresses falling into the latter three categories are entitled to protection without a showing of
4    secondary meaning. Two Pesos, 505 U.S. at 768. While trademarks are rights in gross regarding a
5    particular image, trade dress protects only the general appearance of a particular product or service.
6    Nova Wines, Inc. v. Adler Fels Winery LLC, 467 F. Supp. 2d 965, 977 (N.D. Cal. 2006).

7        The Court finds that Tea on the Town's claimed trade dress is likely protectable. Plaintiffs'
8    claimed trade dress consists of a double-decker bus with a predominantly pink exterior with white
9    and gold, elements of greenery and flowers, and illustrations of people enjoying high tea; a bus
10   interior that is predominantly pink with white and gold accents, including the pink booth color and
11   design, pink table settings, decorative gold vent covers, gold seat number plaques; floral garlands
12   lining the bus ceilings and pearl strips on the ceiling; uniforms incorporating the same shade of
13   pink which predominates in all of Plaintiffs' branding and design; and pink souvenir tumblers with
14   a pink lid, again utilizing the same shade of pink that predominates in the Tea on the Town color
15   scheme.

16       For the same reasons the Court found Plaintiffs' mark to be suggestive, it finds the Tea on
17   the Town trade dress is suggestive. The Court further finds Plaintiffs' unique aesthetic bus design
18   has created a recognizable trade dress specifically related to its product of serving high tea on a
19   bus. The consistent and repeated use of the predominant pink with white and gold, emphasizing
20   florals and other specific decorative elements as described above in a specific manner, and as
21   displayed in the images presented to the Court, is distinctive. Because there is no natural
22   connection between the use of such aesthetic elements and the functionality of serving tea on a
23   bus, the Court finds Plaintiffs will likely succeed in establishing their trade dress is inherently
24   distinctive.

25       Although secondary meaning is not required to protect an inherently distinctive trade dress,
26   a brief discussion of secondary meaning is appropriate given the factors the court must consider in
27   a preliminary injunction inquiry. Trade dress acquires secondary meaning "when the purchasing
28   public associates the dress with a particular source." Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,

826 F.2d 837, 843 (9th Cir. 1987). The fact that Plaintiffs have used the design elements described herein on its buses and promotional materials for a substantial period of time suggests a strong connection between the design and their company and product. As described above, Plaintiffs have become a widely recognized brand precisely through their aesthetic marketing. Accordingly, the Court finds that Plaintiffs are alternatively likely to prevail on the issue of secondary meaning.

3. Likelihood of Confusion

To determine whether Plaintiffs are entitled to injunctive relief regarding its trade dress claim, the central inquiry is whether Defendants' use of the asserted dress is likely to cause consumer confusion. See Brookfield Commc'ns, 174 F.3d at 1053 (quoting Official Airline Guides, Inc., 6 F.3d at 1391 (characterizing the likelihood of confusion inquiry as "[t]he core element of trademark infringement"). A likelihood of confusion exists "when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." Nutri/System, Inc. v. Con–Stan Indus., Inc., 809 F.2d 601, 604 (9th Cir. 1987) (quoting Shakey's Inc. v. Covalt, 704 F.2d 426, 431 (9th Cir. 1983)). "Likelihood of confusion in the trade dress context is evaluated by reference to the same factors used in the ordinary trademark context." Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 616 (9th Cir. 1989).

The Court has already found, in its analysis above, that the Sleekcraft factors weigh in favor of Plaintiffs. Therefore, Plaintiffs have established by a preponderance of the evidence that it will be able to prove a likelihood of consumer confusion at trial.

**b. Irreparable Injury**

By statute, Plaintiffs are entitled to a rebuttable presumption of irreparable harm because it has shown a likelihood that it will succeed on the merits of its trademark infringement claim. 15 U.S.C. § 1116(a); see AK Futures LLC v. Boyd Street Distro, LLC, 35 F.4th 682, 694 (9th Cir. 2022) ("By statute, AK Futures is entitled to a rebuttable presumption of irreparable harm on its trademark claim because the company has shown it will likely succeed on the merits."). Evidence of loss of control over business reputation and damage to goodwill can constitute irreparable harm in the trademark infringement context. Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc., 736 F.3d

1239, 1250 (9th Cir. 2013).

Defendants argue that the fact that they have already ceased to engage in the infringing conduct—they have changed their name, propose changes to their brand and bus design, and ceased operations while attempting to negotiate a settlement with Plaintiffs—means there is no irreparable harm. However, the Court finds Defendants continued to use "Tea on the Strip" in their website source code and, according to Defendants, though they can ensure social media tags of "Tea on the Strip" are not directed to the "Café on the Strip" profile, prior to this injunction, Defendants had not done so. Further, Defendants had indicated to this Court their intent to operate with the brand and bus designs they most recently proposed to Plaintiffs and presented to the Court, which the Court found are likely infringing. Therefore, Defendants have not rebutted the presumption of irreparable harm.

Further, the Court specifically finds that the evidence of actual confusion Plaintiffs have presented, coupled with the evidence presented that Defendants' product is inferior to theirs, is sufficient to show irreparable harm in the form of loss of control over business reputation and damage to goodwill.

This factor therefore favors granting Plaintiffs a preliminary injunction that prohibits the Defendants from continuing to use the "Tea on the Strip" trademark, and from using the interior and exterior bus designs currently before the Court, both of which the Court finds are likely infringing uses.

### c. Balance of the Equities

In balancing the equities, "a court must balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 542 (1987), abrogated in part on other grounds by Winter, 550 U.S. at 20. As discussed above, the Court finds Defendants have failed to rebut the presumption of irreparable harm under 15 U.S.C. § 1116(a). Plaintiffs' interest in preventing further infringement of their trademark and trade dress outweighs Defendants' interest in continued use of the designs and branding this Court finds are likely infringing.

### d. Public Interest

Before issuing an injunction, a court must ensure that the "public interest would not be disserved." eBay v. MercExchange, LLC, 547 U.S. 388, 391 (2006). "Trademarks protect the public from confusion by accurately indicating the source of a product." State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc., 425 F.3d 708, 715 (9th Cir. 2005). Thus, preventing consumer confusion serves the public interest.

### e. Bond

Federal Rule of Civil Procedure 65(c) provides, in pertinent part: "The court may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "Despite the seemingly mandatory language, Rule 65(c) invests the district court 'with discretion as to the amount of security required, if any.'" Johnson v. Couturier, 572 F.3d 1067, 1086 (9th Cir. 2009) (emphasis in original) (quoting Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003)). "The district court is afforded wide discretion in setting the amount of the bond." Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 882 (9th Cir. 2003) (citing Walczak v. EPL Prolong, Inc., 198 F.3d 725, 733 (9th Cir. 1999)).

Because "the purpose of ... a bond is to cover any costs or damages suffered by the [party sought to be enjoined], arising from a wrongful injunction," see Gorbach v. Reno, 219 F.3d 1087, 1092 (9th Cir. 2000), "the party affected by the injunction [bears the] obligation of presenting evidence that a bond is needed." See Conn. Gen, 321 F.3d at 883; accord Gorbach, 219 F.3d at 1092 (affirming district court's decision not to require bond where the party sought to be enjoined "did not show that there would be any" damages). Consequently, if the party affected by the injunction fails to request a bond or submit any evidence regarding its likely damages, the court does not abuse its discretion by setting a bond of zero. See Conn. Gen, 321 F.3d at 882–83.

In their previous Opposition to Plaintiffs' Motions for preliminary relief, Defendants request the Court require Plaintiffs to post a bond in the amount of $1 million dollars. However, they have provided no financial analysis or documentary evidence to support a bond in this amount. Further, the parties do not discuss the issue of the bond amount in briefing the renewed Motions. Nevertheless, the Court in its discretion, finds a substantial bond is appropriate given the likely

- 16 -

cost to Defendants of ceasing operations to finalize their name change, redesign and remodel their bus, reestablish their social media presence under their new name and branding, and the like.

Accordingly, the Court in its discretion, sets the bond at $500,000.

## V. CONCLUSION

The Court, having considered Plaintiffs' Motions and the record, holds Plaintiffs have established their entitlement to injunctive relief, and **GRANTS in part**, the (ECF No. 32) Motion for a Preliminary Injunction. The Court orders as follows:

**IT IS ORDERED** that Defendants are enjoined from using the phrase "Tea on the Strip" and are ordered not to use that phrase as a keyword on their current website and to deactivate any social media tags using the phrase "Tea on the Strip" that redirect a user to their current social media profiles;

**IT IS FURTHER ORDERED** that Defendants are enjoined from using the exterior and interior bus design as it was presented to the Court in the record and at the hearing;

**IT IS FURTHER ORDERED** that Plaintiffs are to post a $500,000 bond by Tuesday, April 22, 2025;

**IT IS FURTHER ORDERED** that the (ECF No. 31) Motion for a Temporary Rrestraining Order is **DENIED** as moot.

**DATED:** June 4, 2025.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**